**Opinion issued February 18, 2016**



In The

# Court of Appeals

For The

# First District of Texas

_____

## NO. 01-15-00733-CV

_____

## IN THE INTEREST OF D.R.L., C.L.W., JR., AND A.E.L., CHILDREN

---

### On Appeal from the 314th District Court
### Harris County, Texas
### Trial Court Case No. 2014-03703J

---

## MEMORANDUM OPINION

In this accelerated appeal,[1] appellants, Margarita Luna and Jason McDonald,

challenge the trial court's order, entered after a bench trial, terminating their parental

rights to their respective minor children, D.R.L., C.L.W., Jr., and A.E.L.[2] In her sole

---

[1]     *See* TEX. FAM. CODE ANN. § 263.405(a) (Vernon 2014); TEX. R. APP. P. 28.4.

[2]     Luna appeals the termination of her parental rights to D.R.L., C.L.W., Jr., and
        A.E.L.  McDonald, the alleged father of D.R.L., appeals the termination of his

issue, Luna contends that the evidence is factually insufficient to support the trial court's finding that termination of her parental rights was in the children's best interest.[3] In his two issues, McDonald contends that the Texas Family Code provision authorizing the termination of the parental rights of "an alleged father"[4] is facially unconstitutional and the evidence is legally and factually insufficient to support the trial court's finding that termination of his parental rights was in D.R.L.'s best interest.[5]

We affirm.

## Background

On July 3, 2014, the Texas Department of Family and Protective Services ("DFPS") filed a petition seeking managing conservatorship and termination of the parental rights of Luna and McDonald to their respective minor children. By affidavit attached to the petition, DFPS Investigator Iris Foster testified that on March 27, 2014, DFPS received a referral alleging physical abuse, neglectful supervision, and physical neglect of D.R.L., C.L.W., Jr., and A.E.L. In the referral, it was specifically alleged that Luna "left home with all three of her

---

parental rights to D.R.L. The father of C.L.W., Jr. and A.E.L does not appeal the termination of his parental rights.

[3] *See* TEX. FAM. CODE ANN. § 161.001(b)(2) (Vernon Supp. 2015).

[4] *See id.* § 161.002 (Vernon Supp. 2015).

[5] *See id.* § 161.001(b)(2).

2

children . . . without letting her father, with whom she lives, know that she was leaving"; did not subsequently respond to calls or text messages to her cellular telephone; would "disappear[] with her children on a regular basis only to return back to her father's apartment after a few days of bouncing from home to home and sleeping in [her] car with her children"; and "has a history of neglect/abuse from 2007 to [the] present," "has repeatedly placed [her children] in dangerous situations without regard [for] their safety," has a "long history of drug abuse and theft," "bounces [her] children from place to place," and allows them "to be around" C.L.W., Jr. and A.E.L.'s father, who has a "history of violence and [an] untreated mental health disorder."

At trial, DFPS caseworker Stephanie Samuel testified that the children[6] came into the care of DFPS due to allegations of "physical abuse, neglectful supervision and physical neglect by [Luna]." Samuel noted that "at the very beginning of the case," and "[t]hroughout [its] duration," Luna tested positive for narcotics use. "[P]rior to when [the case] started," she tested positive for amphetamine, methamphetamine, and cocaine use. In June 2014, she tested positive for codeine use. In July 2014, she tested positive for oxymorphone, oxycodone, and codeine use. And in December 2014, she tested positive for amphetamine,

---

[6] At the time of trial, D.R.L. was eight years old, C.L.W., Jr. was five years old, and A.E.L. was four years old.

3

methamphetamine, and marijuana use. In December 2014, Luna also "walked out on [an] extended opiate zero tolerance test and [an] ETG test and [a] synthetic marijuana test." Finally, in March 2015, she tested positive for marijuana use; however, she told Samuel that she tested positive because she had been "around people that did marijuana" and it "wasn't her drug of choice."[7]

In regard to Luna's family service plan, Samuel explained that although Luna had received it, she "did not complete it successfully."[8] Specifically, Luna "was unsuccessfully discharged from individual therapy . . . and group substance abuse therapy." In other words, she "did not complete [her] individual therapy and [her] group substance abuse therapy." And Luna, during the pendency of this case, continued to use narcotics, violating her family service plan.

Samuel noted that although Luna told Samuel that "she lived with her father," she did not provide "proof of a lease" to establish that "she's supposed to be in the home with her father." And she did not find "independent[]" and "stable housing," which her family service plan required. Further, Luna did not provide "a certificate

---

[7]     At trial, Luna's narcotics-test results were admitted into evidence, revealing that she tested positive for amphetamine, methamphetamine, and cocaine use in April 2014; opiate and codeine use in June 2014; oxymorphone, oxycodone, and codeine use in July 2014; amphetamine, methamphetamine, and marijuana use in December 2014; and marijuana use in March 2015.

[8]     Samuel noted that Luna, in compliance with her family service plan, is employed and did complete her parenting class, submit to narcotics testing, and participate in a psychosocial assessment and a narcotics assessment.

4

for her completion of [her] domestic violence [classes]," which the plan also required. However, Luna did provide child support for D.R.L., keep "in contact with [her] children," and visit the children. Moreover, Luna did bring C.L.W., Jr. and A.E.L. "clothes and shoes" and "some food" at visits, but this did not occur "every time."

Samuel further testified that it was in "[t]he best interest of the children" to terminate Luna's parental rights because she "was still using drugs in March" and the children "need permanency and a stable place to reside." Samuel noted that Luna, who has a criminal history, was "recently" arrested for the offense of theft in February 2015.[9] And Luna has a history with Child Protective Services ("CPS"), with "13 prior referrals" relating to "drug use," "physical abuse," and "sexual abuse of the children." Samuel opined that "it's now in the best interest of the[] children to terminate the parental rights" of Luna, the "alleged fathers," and the unknown father, so the children "can get to permanent stable finality and placement."

According to Samuel, A.E.L. is not "bonded" with Luna, "the children are not bonded" with Luna, and during visits with the children, Luna's "main focus is not

---

[9]     Samuel explained that Luna's "theft charge" was "still pending" at the time of trial. Further, DFPS introduced into evidence Luna's criminal record, which revealed that on October 11, 2012, after violating the terms of her community supervision and following the State's motion to adjudicate guilt, Luna was convicted of the second degree felony offense of tampering with a government record and sentenced to confinement for two years. *See* TEX. PENAL CODE ANN. § 37.10 (Vernon Supp. 2015).

with all three of the children." Further, A.E.L. does not "speak about" her siblings and is not "excited to see anyone" at family visits. A.E.L. is defensive, especially with C.L.W., Jr., "because [he] has done things to her," i.e., he has "physically abuse[d]" her and there was "sexual behavior going on between" the siblings. After family visits, A.E.L. has "[e]motional" "manifestations," and there is concern about her continuing with family visits. She is currently in therapy and is "progressing in her current placement," which is an "adoptive placement." And A.E.L.'s placement is "providing for all of her needs," therapeutic or otherwise.

Samuel explained that C.L.W., Jr. "has lots of issues." He "fights," "doesn't listen," "cries," and has "emotional melt downs." Although he is in individual and sexual abuse therapy and "doing better than he was," especially in regard to "fighting," his "melt downs seem[] to be getting worse." And he is in need of speech therapy, which is in the process of being secured for him. He has also been diagnosed with Attention Deficit Hyperactivity Disorder ("ADHD"). And C.L.W., Jr.'s current placement, which is meeting his physical and emotional needs, is with a "prior daycare teacher," who thinks she will "be able to provide a long term stable home for him, an adoptive placement for him."

Samuel noted that D.R.L. is currently placed with her grandmother, with the potential for adoption, and is doing "okay." She, however, "has made suicidal outcries and other statements at school and at home." Although D.R.L. is in therapy,

6

"struggle[s] in school," and has "issues" with A.E.L, her current placement is meeting her physical and emotional needs.

In regard to McDonald, Samuel testified that she did not "hear[] from [him] at all during the pendency of this case" and, to her knowledge, her "predecessors with CPS" did not have any "contact with him during the course of this case" either. Further, although DFPS "exercised diligence in trying to locate" McDonald and mailed him a family service plan, "it was returned" and DFPS was unable to find him. And no "man [has] c[o]me forward claiming to be the father" of D.R.L.

Jennifer Cassidy, a child advocate and advocacy coordinator, testified that all of the children have had "a great deal of upheaval in their life"; "[t]hey've had periods of time where they were living with [Luna] and then with other people"; and Luna has "an extensive CPS history." D.R.L. "was removed when[] she was very young . . . because [Luna] had drug issues." And Luna has "demonstrated a pattern of getting clean and relapsing," which has resulted in "instability for the children." Thus, Cassidy recommended "termination of the rights of all parents." And she opined that it would be in the best interest of the children for the parental rights of Luna and McDonald to be terminated because of "concerns about [Luna's] stability and ability to maintain a safe and stable home for the[] children."

Cassidy explained that the home that Luna shares with her father is not appropriate for the children. "It is [a] two bedroom apartment," which "mean[s] that

7

the three children would [have to] share a room with . . . Luna, so [there] would be four individuals in one room." And the home is "very cluttered," "to the point of [being] a safety hazard," and "unsettling." Cassidy also expressed "concern[] that [Luna] may not be able to stay [in the apartment] long term as there is no obvious agreement or tangible agreement that she will be able to stay there." In other words, "[h]er name is not on the lease" and "[i]t is not her own home and responsibility." Further, "even while [Luna has been] staying there, she w[ould] not stay there all the time," and she actually went to "other places and stay[ed] . . . for periods" of time.

In regard to the children, Cassidy noted that they "have multiple problems," "psychological and psychiatric issues," and "[a]ll are in need of intense therapeutic intervention." Further, "[t]here has been some improvement," since the children were removed by DFPS.

Luna testified that in 2008, DFPS "removed" D.R.L. from her care because she had been using heroin. Although she received treatment, she relapsed "two years later" and began using methamphetamine "sparingly"—"once every couple months."

In regard to her children, Luna explained that she has had "a lot of involvement" with them, loves them, and has "a bond with each child." Luna received from D.R.L. a letter in which she stated that "she misses [Luna]" and "wants to come home." C.L.W., Jr. also "says [he] want[s] to go home." And any opinion

that A.E.L. is not "bonded" with her is "ridiculous." Luna noted that there is a daycare facility near her home and she would be able to have her work hours coincide with the hours of the daycare facility. She is currently employed full time as a manager at a Sonic restaurant. Luna also has become "an occupant on [her] father's lease" and "would get a bigger apartment." She has plans for the children "to be stable and together," and she does not want them to forget about her. And Luna could take care of the children's emotional, physical, and financial needs.

In regard to her family service plan, Luna explained that she missed "two scheduled evaluations" because of a "permanency conference" and she "was in Longview in court." Otherwise, she has "completed the rest of [her] family service plan." And Luna continues to see her personal counselor for domestic violence, psychological, and substance abuse counseling. She also attends Alcoholics Anonymous ("AA") meetings. However, Luna did admit that she had not completed her domestic violence classes.

Luna explained that although she was arrested for the offense of theft in February 2015, her wrongful conduct occurred in 2013 "before [she] signed any family service plan." She also explained that she failed her narcotics test for marijuana use possibly because she had been "around" C.L.W., Jr. and A.E.L.'s father while he was "smoking" in January, marijuana was "never" her "drug of choice," and "[t]hat's the only way [she] could have possibly failed." Luna did admit

to testing positive for narcotics use in February 2014, noting that she had sustained "a fracture, compression fracture at L-1" in her back and was "taking opiate and Vicodin, Lorcet, Norco," "Tylenol Three," and "Tylenol Four" to "control the pain."

Luna further explained that while she was previously incarcerated, the children were "physically abused" and "[s]exually abused." She admitted that she did not have a prescription for methamphetamines and "taking drugs, other than prescription drugs," "endanger[s] the physical and emotional well being of [her] children." She also conceded that "having [the] children around" individuals with "extensive criminal history as well as drug history," like C.L.W., Jr. and A.E.L.'s father, "endanger[s]" the children.

## Sufficiency of the Evidence

In her sole issue, Luna argues that the evidence is factually insufficient to support the trial court's finding that termination of her parental rights was in the children's best interest because "most of the *Holley* factors weigh heavily in favor of maintaining her parental bond." *See Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976).

In order to terminate the parent-child relationship, DFPS must establish, by clear and convincing evidence, one or more of the acts or omissions enumerated under Texas Family Code section 161.001(b)(1) and that termination is in the best interest of the child. *See* TEX. FAM. CODE ANN. § 161.001(b) (Vernon Supp. 2015).

10

Both elements must be established, and termination may not be based solely on the best interest of the child as determined by the trier of fact. *Id.*; *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987).

Luna "concedes" that the evidence is sufficient to support the trial court's finding that she "failed to comply with the provisions of a court order that specifically established the actions necessary for [her] to obtain the return of the child[ren] who ha[d] been in the permanent or temporary managing conservatorship of [DFPS] for not less than nine months as a result of the child[ren's] removal from [her] under Chapter 262 for the abuse or neglect of the child[ren]." *See* TEX. FAM. CODE ANN. § 161.001(b)(1)(O). However, she challenges the factual sufficiency of the evidence to support the trial court's finding that termination of her parental rights was in the children's best interest.

A parent's right to "the companionship, care, custody, and management" of her children is a constitutional interest "far more precious than any property right." *Santosky v. Kramer*, 455 U.S. 745, 758–59, 102 S. Ct. 1388, 1397 (1982) (internal quotations omitted). The United States Supreme Court has emphasized that "the interest of parents in the care, custody, and control of their children . . . is perhaps the oldest of the fundamental liberty interests recognized by this Court." *Troxel v. Granville*, 530 U.S. 57, 65, 120 S. Ct. 2054, 2060 (2000). Likewise, the Texas Supreme Court has concluded that "[t]his natural parental right" is "essential," "a

11

basic civil right of man," and "far more precious than property rights." *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985) (internal quotations omitted). Consequently, "[w]e strictly construe involuntary termination statutes in favor of the parent." *In re E.N.C.*, 384 S.W.3d 796, 802 (Tex. 2012).

Because termination of parental rights "is complete, final, irrevocable and divests for all time that natural right . . . , the evidence in support of termination must be clear and convincing before a court may involuntarily terminate a parent's rights." *Holick*, 685 S.W.2d at 20. Clear and convincing evidence is "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." TEX. FAM. CODE ANN. § 101.007 (Vernon 2014); *see also In re J.F.C.*, 96 S.W.3d 256, 264 (Tex. 2002). Because the standard of proof is "clear and convincing," the Texas Supreme Court has held that the traditional legal and factual standards of review are inadequate. *In re J.F.C.*, 96 S.W.3d at 264–68.

In conducting a factual-sufficiency review in a parental-rights termination case, we must determine whether, considering the entire record, including evidence both supporting and contradicting the finding, a fact finder reasonably could have formed a firm conviction or belief about the truth of the matter on which DFPS bore the burden of proof. *In re C.H.*, 89 S.W.3d 17, 25 (Tex. 2002). We should consider whether the disputed evidence is such that a reasonable fact finder could not have

12

resolved the disputed evidence in favor of its finding. *In re J.F.C.*, 96 S.W.3d at 266–67. "If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient." *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006) (internal quotations omitted).

In determining whether the termination of appellant's parental rights is in the children's best interest, we may consider several factors, including (1) the children's desires, (2) the current and future physical and emotional needs of the children, (3) the current and future emotional and physical danger to the children, (4) the parental abilities of the parties seeking custody, (5) whether programs are available to assist those parties, (6) plans for the children by the parties seeking custody, (7) the stability of the proposed placement, (8) the parent's acts or omissions that may indicate that the parent-child relationship is not proper, and (9) any excuse for the parent's acts or omissions. *See Holley*, 544 S.W.2d at 371–72; *In re L.M.*, 104 S.W.3d 642, 647 (Tex. App.—Houston [1st Dist.] 2003, no pet.). The *Holley* factors are not exhaustive, and there is no requirement that DFPS prove all factors as a condition precedent to termination of parental rights. *See In re C.H.*, 89 S.W.3d at 27.

In regard to the children's desires, Samuel testified that "the children are not bonded" with Luna, especially A.E.L. A.E.L. also does not "speak about" her siblings and is not "excited to see anyone" at family visits. After family visits, A.E.L. has "[e]motional" "manifestations," and there is concern regarding continuing family visits for A.E.L.

In contrast, Luna testified that she has "a bond with each child" and both D.R.L. and C.L.W., Jr. "want[] to come home." She also received from D.R.L. a letter in which she stated that "she misses [Luna]." Luna argues that because D.R.L. and C.L.W., Jr. expressed the desire "to maintain the[ir] . . . bond with their mother," it is not in the best interest of the children for her parental rights to be terminated.

We note that although "[a] child's love for her natural parent is an important consideration in the best interest determination," "[e]ven where a child is attached to a parent, . . . [a] child's desire to be returned to the parent [is] not . . . dispositive of the best interest analysis," especially "if the parent has engaged in conduct dangerous to the child's well-being." *In re M.S.L.*, No. 14-14-00382-CV, 2014 WL 5148157, at *9 (Tex. App.—Houston [14th Dist.] Oct. 14, 2014, no pet.) (mem. op.); *cf. In re N.T.*, 474 S.W.3d 465, 478–79 (Tex. App.—Dallas 2015, no pet.) (fact finder could reasonably form firm belief or conviction regarding termination in child's best interest, despite child's "expressed desire to live primarily with [m]other").

In regard to the children's current and future physical and emotional needs, Samuel testified that the children "need permanency and a stable place to reside." *See In re K.C.*, 219 S.W.3d 924, 931 (Tex. App.—Dallas 2007, no pet.) (child's need for stable, permanent home paramount consideration in best interest determination). And Cassidy testified that the children "have multiple problems" and "psychological and psychiatric issues" and "are in need of intense therapeutic intervention." *See Adams v. Tex. Dep't of Family & Protective Servs.*, 236 S.W.3d 271, 280 (Tex. App.—Houston [1st Dist.] 2007, no pet.) (relying on evidence "that it would be in the child's best interest to be raised in a consistent, stable, and nurturing environment" and noting "[b]oth children have unique emotional issues").

According to Samuel, the children, especially A.E.L., are not "bonded" with Luna. A.E.L. does not speak about her family, is not "excited to see anyone" at family visits, and has negative emotional reactions after family visits. There is "concern" regarding the "continuation of family visits" for A.E.L. and "what th[ey] do[] to her." Further, A.E.L.'s brother, C.L.W., Jr., has "done things to her" involving physical and sexual abuse, which has caused A.E.L. to become "defensive." A.E.L. is in therapy, and her "adoptive placement" is providing for "all" of her needs, therapeutic or otherwise.

Samuel further explained that C.L.W., Jr. "has lots of issues." He "fights," "doesn't listen," "cries," and has "emotional melt downs." He has been diagnosed

with ADHD and attends individual and sexual abuse therapy. And he is in need of speech therapy, which is in the process of being secured for him. Also, C.L.W., Jr.'s current placement is meeting his emotional and physical needs and may "be able to provide a long term stable home for him, an adoptive placement for him."

In regard to D.R.L., Samuel noted that she is doing "okay." However, she "has made suicidal outcries and other statements at school and at home." D.R.L. is in therapy, "struggle[s] in school," and has "issues" with A.E.L. And D.R.L.'s current placement is meeting her physical and emotional needs.

Samuel noted that Luna has a "CPS history," a criminal history, and a history of narcotics use. And Cassidy testified that there have been concerns about Luna's "stability and ability to maintain a safe and stable home for the[] children." "The children have had a great deal of upheaval in their life"; "[t]hey've had periods of time where they were living with [Luna] and then with other people." Cassidy opined that the current home that Luna shares with her father is not appropriate for the children. The home is "very cluttered," "to the point of [being] a safety hazard," and all of the children would have to share a single bedroom with Luna. And Cassidy expressed her concern about Luna's long-term ability to stay in her father's home, noting that "even while [Luna has been] staying there, she w[ould] not stay there all the time"; "[s]he will go [to] other places and stay . . . for periods" of time. *Cf. Adams*, 236 S.W.3d at 280 (parent's history of failing to provide children with

"stable and nurturing environment" "demonstrates" termination of parental rights in best interest of children).

Luna did testify that she is a full-time employee and a manager at a Sonic restaurant. She explained that were the children returned to her, there is a daycare facility near her home and she would be able to have her work hours coincide with the hours of the daycare facility. She also "would get a bigger apartment" and "plan[s] for" the children "to be stable and together." However, Luna also admitted to using narcotics, that she stood accused of the offense of theft, and that while she was previously incarcerated, the children were physically and sexually abused.

Luna specifically argues that the evidence is factually insufficient to support the trial court's best interest finding in regard to D.R.L. because she is only "doing 'okay'" in her current placement, has made "'suicidal outcries and other statements,'" and "had a break down when [a] volunteer told her she would not be able to see her siblings anymore." Luna specifically argues that the evidence is factually insufficient to support the trial court's best interest finding in regard to C.L.W., Jr. because he is "faring worse in DFPS custody" and "[h]is emotional meltdowns are getting worse." We note, however, that there is no evidence that the current struggles of D.R.L. or C.L.W., Jr. are being caused by their current respective placements.

In regard to current and future emotional and physical danger to the children, Samuel testified that the children came into the care of DFPS due to allegations of "physical abuse, neglectful supervision and physical neglect by [Luna]." Further, at the beginning of the case, and "throughout [its] duration," Luna has repeatedly tested positive for narcotics use. Samuel noted that Luna has tested positive for amphetamine, methamphetamine, cocaine, codeine, oxymorphone, oxycodone, and marijuana use. And during the pendency of this case, Luna, in December 2014, "walked out on [an] extended opiate zero tolerance test and [an] ETG test and [a] synthetic marijuana test." The results of Luna's narcotics testing were admitted into evidence and show that she tested positive for amphetamine, methamphetamine, and cocaine use in April 2014; opiate and codeine use in June 2014; oxymorphone, oxycodone, and codeine use in July 2014; amphetamine, methamphetamine, and marijuana use in December 2014; and marijuana use in March 2015. *Cf. In re T.L.S.*, No. 01-12-00434-CV, 2012 WL 6213515, at \*6–7 (Tex. App.—Houston [1st Dist.] Dec. 13, 2012, no pet.) (mem. op.) (considering parent's refusal to take court-ordered narcotics test in analyzing emotional and physical danger to children); *In re S.B.*, 207 S.W.3d 877, 886–87 (Tex. App.—Fort Worth 2006, no pet.) (parent's narcotics use considered in determining current and future emotional and physical danger to children).

Luna testified that D.R.L. had been "removed" from her care in 2008 because of her heroin use at the time, and, although she received treatment, she relapsed "two years later" and began using methamphetamine "once every couple months." Regarding her failed narcotics tests, Luna did explain that she could have tested positive for marijuana use because she was "around" C.L.W., Jr. and A.E.L.'s father while he was "smoking," but she did admit to testing positive for narcotics use in February 2014. Luna also admitted that "taking drugs . . . endanger[s] the physical and emotional well being of [her] children" and "having [the] children around" individuals with "extensive criminal histor[ies] as well as drug histor[ies]," like the father of C.L.W., Jr. and A.E.L., also endangers the children. *See In re U.P.*, 105 S.W.3d 222, 231 (Tex. App.—Houston [14th Dist.] 2003, pet. denied) (parent's use of narcotics considered when evaluating current and future emotional and physical danger to child).

Samuel also noted that Luna had previously been convicted of the second degree felony offense of tampering with a government record and sentenced to confinement for two years. *See In re U.P.*, 105 S.W.3d at 231–32 (parent's criminal history supports best interest finding in regard to termination of parental rights). And Luna, herself, admitted that while she was incarcerated, the children were physically and sexually abused.

Samuel further noted that Luna had a "CPS history," consisting of "13 prior referrals" related to "drug use," "physical abuse," and "sexual abuse of the children." And, as noted above, Luna admitted that D.R.L. had previously been "removed" from her care due to Luna's prior heroin use. *See In re E.C.R.*, No. 01-11-00791-CV, 2013 WL 5498127, at *3 (Tex. App.—Houston [1st Dist.] Oct. 1, 2013, no pet.) (mem. op.) ("[E]vidence of past misconduct or neglect can be used to measure a parent's future conduct.").

In regard to the programs available to assist Luna, she explained that she continues to see her personal counselor for domestic violence, psychological, and substance abuse counseling. And she attends AA meetings. However, she did not complete her domestic violence classes. Samuel noted that Luna did not "successfully" complete her family service plan and "did not complete [her] individual therapy and [her] group substance abuse therapy." And Luna did not provide "a certificate for completion of [her] domestic violence [classes]." *See In re T.L.S.*, 2012 WL 6213515, at *7 (considering whether parent completed all required services under her family service plan).

In regard to the stability of Luna's home, Samuel noted that although Luna told her that "she lives with her father," Luna did not provide "proof of a lease that she's supposed to be in the home with her father" and she did not find "independent[]" and "stable housing." Cassidy noted that Luna shares a home with

20

her father that is not appropriate for the children. "It is [a] two bedroom apartment," which "mean[s] that the three children would [have to] share a room with . . . Luna, so [there] would be four individuals in one room." The home is "very cluttered," "to the point of [being] a safety hazard," and Cassidy has concerns that Luna "may not be able to stay [in the apartment] long term as there is no obvious agreement or tangible agreement that she will be able to stay there." Cassidy further noted that "even while [Luna has been] staying [in the apartment], she w[ould] not stay there all the time"; "[s]he will go [to] other places and stay . . . for periods" of time.

Although Luna testified that she "would get a bigger apartment" and she, at the time of trial, was "an occupant on [her] father's lease," evidence of Luna's criminal record showed that she had previously been sentenced to confinement for two years for the second degree felony offense of tampering with a government record. Luna also admitted to narcotics use in the past, and DFPS presented evidence of Luna's continued narcotics use throughout the pendency of this case.

Luna asserts that, contrary to the trial court's best interest finding, D.R.L. and C.L.W., Jr., at the time of trial, were not in "stable placements." According to Luna, "D.R.L.'s placement with her grandmother was described as 'tentative,'" and C.L.W., Jr.'s placement was "non-adoptive" and it is "speculative" as to whether it would "'be able to provide a long term stable home.'"

21

Samuel explained that the children are in three separate placements. In regard to the stability of the A.E.L.'s adoptive placement, she is "progressing," the placement is meeting "all" of her needs, therapeutic or otherwise, and the goal is for A.E.L. to be adopted by her current foster parents. In regard to C.L.W., Jr.'s placement, it is not an "adoptive placement," but is in a "fictive kin placement" with "his prior daycare teacher." However, this placement "might be able to provide a long term stable home for, him, an adoptive placement." And his placement is "protective" and meeting his physical and emotional needs. D.R.L. is currently placed with her grandmother. Although there are some "concerns" with the placement and "it's a tentative approval," the goal is for D.R.L. "to stay in her current placement and potentially be adopted there." And, according to Samuel, D.R.L.'s current placement is meeting her physical and emotional needs.

Evidence of placement plans and adoptions are, of course, relevant to a best interest determination. *In re C.H.*, 89 S.W.3d at 28. "However, [a] lack of evidence about definitive plans for permanent placement and adoption cannot be the dispositive fact; otherwise determinations regarding best interest would regularly be subject to reversal on the sole ground that an adoptive family has yet to be located." *Id.*; *see also In re E.C.R.*, 402 S.W.3d 239, 250 (Tex. 2013). Instead, we must determine, based on the entire record, whether a fact finder could reasonably form a firm conviction or belief that termination of parental rights is in the children's best

22

interest, even if DFPS has not yet "identif[ied] with precision the child's future home environment." *In re C.H.*, 89 S.W.3d at 28; *see also In re E.C.R.*, 402 S.W.3d at 250.

In regard to acts or omissions that may indicate that the parent-child relationship is not proper, a parent's use of narcotics, inability to provide a stable home, and failure to comply with her family service plan support a finding that termination of the parental rights is in the best interest of the children. *In re S.B.*, 207 S.W.3d at 887–88. As discussed above, there is ample evidence that Luna did use, and continued to use during the pendency of this case, narcotics, is unable to provide a stable and permanent home for the children, and has failed to comply with her family service plan.

However, Luna did present evidence that she has "accepted responsibility" regarding her narcotics use. And she has taken "positive steps to improve her parenting abilities," such as attending AA meetings and participating in therapy, being employed full time, making child support payments for D.R.L., and visiting her children. Luna asserts that these "positive steps" and her acceptance of responsibility indicate that termination of her parental rights is not in the children's best interest. However, such evidence of improved conduct, especially over a short duration, does not conclusively negate the probative value of a long history of narcotics use and inappropriate choices. *See In re J.O.A.*, 283 S.W.3d 336, 346 (Tex.

2009); *see also In re J.F.C.*, 96 S.W.3d at 272 (holding fact finder could reasonably form firm belief or conviction termination of parental rights in child's best interest despite evidence "mother found work," "parents' landlord . . . testified that their home was a 'safe environment,'" and "parents made attempts to comply with some parts of the trial court's order").

Here, despite Luna's positive steps, there is evidence that she continued to test positive for narcotics use throughout the pendency of this case, including as recently as March 2015, failed to successfully complete her family service plan, and is unable to provide a stable and permanent home for the children. *Cf. In re J.F.C.*, 96 S.W.3d at 268–72.

After considering the entire record, we conclude that the trial court could have reasonably formed a firm believe or conviction that termination of Luna's parental rights was in the children's best interest. We further conclude that the trial court could have reconciled any disputed evidence in favor of finding that termination of Luna's parental rights was in the children's best interest or was not so significant that the trial court could not have reasonably formed a firm belief or conviction that termination was in the children's best interest. Accordingly, we hold that the evidence is factually sufficient to support the trial court's finding that termination of Luna's parental rights was in the children's best interest.

We overrule Luna's sole issue.

## Constitutionality of Texas Family Code Section 161.002

In his first issue, McDonald argues that Texas Family Code section 161.002, which authorizes the termination of the parental rights of "an alleged father," is unconstitutional "on its face," necessarily resulting in a "denial of procedural due process, because the legislature's purpose in enacting the statute was to "'streamline the adoption process,'" rather than to "reestablish the natural connection between a father and his child." *See* TEX. FAM. CODE ANN. § 161.002 (Vernon Supp. 2015). On this basis, McDonald requests that "this Court deem the evidence legally and factually insufficient to establish [section] 161.002(b)(1) termination grounds."

When reviewing the constitutionality of a statute, we begin with a presumption that it is constitutional. *Walker v. Gutierrez*, 111 S.W.3d 56, 66 (Tex. 2003); *see also* TEX. GOV'T CODE ANN. § 311.021(1) (Vernon 2013) ("In enacting a statute, it is presumed that: (1) compliance with the constitutions of this state and the United States is intended."). A party may challenge a statute as being unconstitutional on its face or as applied to that party. *City of Corpus Christi v. Pub. Util. Comm'n of Tex.*, 51 S.W.3d 231, 240–41 (Tex. 2001); *Tex. Workers' Comp. Comm'n v. Garcia*, 893 S.W.2d 504, 518 & n.16 (Tex. 1995). The party challenging a statute's constitutionality has the burden of proving that the statute fails to meet constitutional requirements. *Walker*, 111 S.W.3d at 66.

We note that a facial challenge to a statute is "the most difficult challenge to mount successfully" because the challenger must establish that no set of circumstances exists under which the statute will be valid. *United States v. Salerno*, 481 U.S. 739, 745, 107 S. Ct. 2095, 2100 (1987). To sustain a facial challenge, the party must show that the statute, by its terms, *always* operates unconstitutionally. *Garcia*, 893 S.W.2d at 518. In reviewing a facial challenge to a statute's constitutionality, we consider the statute as written, rather than as it operates in practice. *See FM Props. Operating Co. v. City of Austin*, 22 S.W.3d 868, 873 (Tex. 2000).

Section 161.002, in pertinent part, provides as follows:

> The rights of an alleged father may be terminated if: (1) after being served with citation, he does not respond by timely filing an admission of paternity or a counterclaim for paternity under Chapter 160.

TEX. FAM. CODE ANN. § 161.002(b)(1).

McDonald asserts that the legislature, in enacting section 161.002, has "made it far too easy and convenient for . . . fathers across th[e] State to lose their natural and legal right to parent" and a father's "right to parent" is not protected by section § 161.002. In response, DFPS argues that because McDonald did not raise this issue in the trial court, he waived it.

The rules governing error preservation apply in civil cases involving the termination of parental rights. *In re K.A.F.*, 160 S.W.3d 923, 928 (Tex. 2005); *In re*

26

*B.L.D.*, 113 S.W.3d 340, 354–55 (Tex. 2003). To preserve a complaint for our review, a party must have presented to the trial court a timely request, objection, or motion that states the specific grounds for the desired ruling, if they are not apparent from the context of the request, objection, or motion. TEX. R. APP. P. 33.1(a). If a party fails to do this, error, including constitutional error, is not preserved, and a complaint is waived. *See In re L.M.I.*, 119 S.W.3d 707, 711 (Tex. 2003).

Here, McDonald has failed to provide this Court with any record citations showing that he raised his constitutional complaint regarding section 161.002 in the trial court, and our examination of the record has revealed none. Accordingly, we hold that he has waived his complaint. *See id.*

In regard to McDonald's assertion that the evidence is "legally and factually insufficient to support the termination of [his] parental rights" under section 161.002(b)(1), we note that he has not provided this Court with any argument or analysis to support this assertion. *See* TEX. R. APP. P. 38.1(i) (appellate brief "must contain a clear and concise argument for the contentions made, with appropriate citations to authorities and to the record"); *In re K.C.B.*, 280 S.W.3d 888, 893–96 (Tex. App.—Amarillo 2009, pet. denied) (parent waived sufficiency complaint in termination-of-parental-rights case due to inadequate briefing).

Nevertheless, we note that in conducting a legal-sufficiency review in a termination-of-parental-rights case, we must determine whether the evidence,

viewed in the light most favorable to the finding, is such that the fact finder could reasonably have formed a firm belief or conviction about the truth of the matter on which DFPS bore the burden of proof. *In re J.F.C.*, 96 S.W.3d at 266. In viewing the evidence in the light most favorable to the finding, we "must assume that the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so," and we "should disregard all evidence that a reasonable factfinder could have disbelieved or found to be incredible." *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005) (internal quotations omitted). However, this does not mean that we must disregard all evidence that does not support the finding. *In re J.F.C.*, 96 S.W.3d at 266. Because of the heightened standard, we must also be mindful of any undisputed evidence contrary to the finding and consider that evidence in our analysis. *Id.* If we determine that no reasonable trier of fact could form a firm belief or conviction that the matter that must be proven is true, we must hold the evidence to be legally insufficient and render judgment in favor of the parent. *Id.* In regard to McDonald's factual-sufficiency complaint, we follow the pertinent standard of review as discussed above.

Here, in regard to section 161.002(b)(1), the trial court found, in pertinent part, as follows:

> The Court finds by clear and convincing evidence that, after having waived service of process or being served with citation in this suit, . . . McDonald did not respond by timely filing an admission of paternity or by filing a counterclaim for paternity or for voluntary

28

paternity to be adjudicated under chapter 160 of the Texas Family Code before the final hearing in this suit.

*Cf.* TEX. FAM. CODE ANN. § 161.002(b)(1).

The record shows that McDonald was served with citation in this suit.[10] However, nothing in the record reflects that he filed an admission of paternity or otherwise claimed paternity by writing to the trial court about being D.R.L.'s father, appearing at trial to testify that he was D.R.L.'s father, or performing any other act that would have prevented the summary termination of his parental rights.[11] *See id.* § 161.002(b)(1); *Phillips v. Tex. Dep't of Protective & Regulatory Servs.*, 25 S.W.3d 348, 357 (Tex. App.—Austin 2000, no pet.) (section 161.002(b)(1) permits trial court to summarily terminate alleged father's parental rights where he fails to assert his paternity); *cf. In re K.R.L.*, No. 01-14-00213-CV, 2014 WL 3843520, at *9–11

---

[10]    DFPS introduced into evidence a proper return of citation and a certificate of paternity registry search, which demonstrates that McDonald never registered. *Cf. R.H. v. Tex. Dep't of Family & Protective Servs.*, No. 08-12-00364-CV, 2013 WL 1281775, at *6 (Tex. App.—El Paso Mar. 28, 2013, no pet.) (summary termination of alleged father's rights authorized where record revealed he failed to file admission of paternity or counterclaim for paternity under Chapter 160 and DFPS introduced evidence of proper return of citation and certificates of paternity registry searches demonstrating failure to register).

[11]    For instance, McDonald's answer contains only a general denial. *Cf. In re L.J.*, No. 07-14-00319-CV, 2015 WL 222313, at *2 (Tex. App.—Amarillo Jan. 15, 2015, no pet.) (mem. op.) (although answer filed on behalf of alleged father, it "did not contain an admission of paternity or a counterclaim for paternity"); *see also In re C.M.C.*, 273 S.W.3d 862, 879 (Tex. App.—Houston [14th Dist.] 2008, pet. denied) (alleged father filed in trial court answer "in which he identified himself as the father of [the children]").

(Tex. App.—Houston [1st Dist.] Aug. 5, 2014, no pet.) (mem. op.) (evidence sufficient to support termination under section 161.002(b)(1) where alleged father "made no representations in the trial court that he was [child's] father," "did not testify at trial," and "refus[ed] to participate in court-ordered DNA testing"). Further, there is no evidence that McDonald offered to take a paternity test or made an effort to establish his interest in any relationship with D.R.L. before the termination of his parental rights. *Cf. In re D.T.*, No. 02-13-00331-CV, 2014 WL 261408, at *2–3 (Tex. App.—Fort Worth Jan. 23, 2014, no pet.) (mem. op.) (no evidence alleged father offered to take paternity test "or made any effort outside of a single visit with [child]—during which [he] slept and tested positive for drugs—to establish his interest in any relationship with [child]").

We overrule McDonald's first issue.

### Best Interest of D.R.L.

In his second issue, McDonald argues that the evidence is legally and factually insufficient to support the trial court's finding that termination of his parental rights was in D.R.L.'s best interest because the trial court "was not confronted with any evidence" to support the finding. *See* TEX. FAM. CODE ANN. § 161.001(b)(2) (requiring termination to be "in the best interest of the child"). In response, DFPS asserts that it was not required to "prove that termination of [McDonald's] potential

parental rights was in the child's best interest" in order to obtain "a judgment for parental termination under [s]ection 161.002." *See id.* § 161.002(b)(1).

Here, section 161.002(b)(1) authorizes the summary termination of an alleged father's parental rights where "after being served with citation, he does not respond by timely filing an admission of paternity or a counterclaim for paternity under Chapter 160." *Id.* The trial court specifically terminated McDonald's parental rights under section 161.002(b)(1), not section 161.001. And section 161.002(b)(1) does not require a best interest finding. *Compare id.* § 161.001(b)(2), *with id.* § 161.002(b)(1); *see also R.H. v. Tex. Dep't of Family & Protective Servs.*, No. 08-12-00364-CV, 2013 WL 1281775, at *7 (Tex. App.—El Paso Mar. 28, 2013, no pet.) (overruling alleged father's complaint "Department failed to prove by clear and convincing evidence that termination of his parental rights was in the best interest of the children," where rights terminated under section 161.002(b)(1), because no best interest finding required).

Simply put, under section 161.002(b)(1), a trial court may summarily terminate an alleged father's parental rights when he does not file an admission of paternity or counterclaim for paternity under Chapter 160 "without requiring [DFPS] to prove that the father engaged in one of the types of conduct listed in section 161.001[(b)](1) of the [Family] Code or that termination is in the best interest of the

child." *In re L.J.*, No. 07-14-00319-CV, 2015 WL 222313, at *2 (Tex. App.—

Amarillo Jan. 15, 2015, no pet.) (mem. op.).

We overrule McDonald's second issue.

## Conclusion

We affirm the judgment of the trial court.

Terry Jennings
Justice

Panel consists of Justices Jennings, Keyes, and Bland.